766 N.E.2d 718 (2002)
In re the PATERNITY OF R.A.F. and J.L.F.
Victoria L. Alexander, Appellant-Petitioner,
v.
John Leslie FOY, Appellee-Respondent,
& R.A.F. by next friend Victoria Alexander,
& J.L.F. by next friend Victoria L. Alexander.
No. 45A03-0104-JV-126.
Court of Appeals of Indiana.
March 18, 2002.
Rehearing denied May 30, 2002.
*720 R. Cordell Funk, Funk & Foster, Hammond, IN, Attorney for Appellant.

*719 OPINION
ROBB, Judge.
Victoria Alexander ("Mother") and John Foy ("Father") share two children, R.A.F., born April 15, 1990, and J.L.F., born January 25, 1992. Mother brings this interlocutory appeal of the trial court's order granting emergency temporary custody of the children to Father pursuant to his petition. We affirm.

Issues
Mother raises several issues for our review, which we consolidate and restate as follows:
1. Whether the Indiana court properly exercised jurisdiction in granting the emergency temporary change of custody; and
2. Whether Mother was denied due process in the handling of the emergency petition for change of custody.

Facts and Procedural History
Mother and Father became involved in 1988 and are the parents of two children. The parties separated in October 1995, and in November 1996, Mother filed an action for paternity in Lake Superior Court. Soon thereafter, she moved to Arizona *721 with the children, where they all resided continuously until August of 2000.
The parties filed an Agreed Order in the paternity action with respect to the issue of paternity, establishing that Father is the biological father of the two children, and with respect to temporary child support. The issues of custody and visitation were tried to the court. The court entered an order granting custody of the two children to Mother, granting regular visitation to Father per a schedule set forth in the order, and ordering Father to pay $73.00 per week in child support, plus an additional $20 per week toward a child support arrearage.
On May 31, 2000, the Arizona Department of Economic Security filed a "Dependency Petition" with respect to R.A.F. and J.L.F.[1] The petition alleged that a report against Mother had been made to Child Protective Services after Family Preservation Services had completed their efforts in working with the family. The petition alleged that the "children continue to live at a high level of risk in the home due to [Mother's] inability to provide a safe and nurturing home." Appellant's Appendix at 30. In the year preceding the petition, there had been ten reports of neglect filed against Mother, two of which were substantiated and one of which was proposed for substantiation. The reports were based upon "lack of/poor supervision, medical needs not being met, drug use in the home, lack of parenting skills, and health risks in the home environment." Appellant's Appendix at 31. The petition noted that Mother's home is "untenable" because of frequent attempts to evict her for complaints of noise, drug activity, frequent police activity, and non-payment of rent. Id. However, because the children's basic needs were being met and they did not appear to be in imminent harm, the petition requested that the children be made temporary wards of the court and committed to the care, custody and control of the Arizona Department of Economic Security, but that physical custody remain with Mother. Father was named in the petition as the father of R.A.F. and J.L.F., but his whereabouts were listed as unknown, so he did not become aware of the petition until sometime in July of 2000.
After learning of the Arizona Dependency Petition, Father traveled to Arizona and contacted an attorney there. That attorney was in contact with the Arizona Attorney General's office which represents Child Protective Services. He was advised by the Attorney General's office that "the fastest way for [Father] to obtain custody of the children in Arizona would be for him to obtain a custody order from the State of Indiana, which would then need to be domesticated in Arizona." Appellant's Appendix at 38. Then, on August 4, 2000, R.A.F. and J.L.F. were removed from Mother's custody and placed in foster care pending a Motion for Change of Physical Custody. On August 7, 2000, Father filed with the Lake Superior Court an Emergency Petition for Change of Custody, alleging the circumstances described above and requesting an order granting emergency temporary custody of the children to Father. At approximately 12:05 p.m. on August 7, Father's counsel had faxed a copy of the petition to Mother's last known Indiana counsel. Father and his counsel appeared in Lake Superior Court some time during the afternoon of August 7 for a hearing, at the conclusion of which the trial court found that an emergency existed and ordered an immediate temporary *722 change of custody. The court also set a further hearing on change of custody issues for August 28, 2000. Neither Mother nor anyone appearing on her behalf attended the hearing. Father traveled to Arizona and returned with the children to Indiana.
On August 22, 2000, Mother filed a Motion to Dismiss the Petition for Emergency Change of Custody. In her motion, Mother alleged that the Lake Superior Court did not have jurisdiction to enter a custody order because pursuant to the Uniform Child Custody Jurisdiction Act ("UCCJA"), Arizona is the home state of the children and the only state with jurisdiction to enter such an order. The August 28 custody hearing was continued at the request of the parties, and a hearing was set on Mother's motion. That hearing was later vacated when the parties agreed to submit the case to the trial court on a stipulation of facts. The stipulation reads as follows:
1. Since this Court's Order of July 17, 1997, [Mother] has resided continuously in Arizona with the parties' children, [R.A.F.], born April 15, 1990, and [J.L.F.], born August 25, 1992.
2. During that time [the] children have attended school in Arizona until they were removed from Arizona by [Father] on/or about August 7, 2000. This was done in response to this Court's Emergency Order of August 7, 2000.
3. That the children now are enrolled in Indiana at Tri-Creek Elementary School located in Lowell, Indiana.
4. [Father] has lived in Indiana continually since the Court's Order of July 17, 1997.
5. The Arizona Delinquency Petition which was attached to [Father's] pleadings was terminated and dismissed but is presently before the Arizona Court on [Mother's] Request for Reinstatement, which both sides have briefed.
6. [The] children's maternal and paternal grandparents continue to reside and have resided in Indiana since this Court's July, 1997 Order.
Appellant's Appendix at 77-78. Subsequent to the filing of this stipulation, Mother filed a Motion to Set Aside the Emergency Custody Order, alleging that, in addition to the jurisdictional defect in the custody order, the notice she received of the August 7 emergency hearing on the motion was defective.
The trial court announced its decision in court with Father, Father's counsel, and Mother's counsel present:
... [I]t appears that no other state would have jurisdiction or another state has declined to exercise jurisdiction on the ground that this state is a more appropriate forum to determine the custody of the children ... and it is in the best interest of the child that this Court assume jurisdiction.... I understand your Motion to Vacate because of lack of noticeand I'm going to find that I'm not going to set aside that order based on lack of notice, because I felt it was in the best interests of the minor children that something be determined at that point. But, it was the testimony of [Father] that these children were going to be taken into protective custody. And he was told by a Court with jurisdiction, maybe this is not a custody proceeding, that he needs to get an order of custody or these kids are going to go into foster care. Therefore, I will find that another state has declined to exercise jurisdiction. And they had the jurisdiction to hold on to [sic] the children. They did not. They didn't tell [Father], file an order here. They said, we will honor an order from the Indiana Court. And it's my understanding that they honored *723 that order, dismissed the petition and released the children to [F]ather. Therefore, I'm going to find that under jurisdiction, XX-XX-X-X(4)(A), that I did have jurisdiction to issue that order and that it was in the best interests of the children that the Court assume jurisdiction. I will also find that it was in the best interest of the children that I heard that on an emergency basis. Am I happy with the notice, no. But, did I find it was in the best interest of the children, yes. Therefore, for purposes of custody, this matter[Father] only has temporary custody. There will be a custody hearing that has to take place in this state. And that's the order of the Court.
Transcript (Jan. 18, 2001, hearing) at 6-7.
Mother then properly instituted this interlocutory appeal of the trial court's order. Additional facts will be provided as necessary.

Discussion and Decision[2]

I. Jurisdiction under UCCJA

A. Standard of Review
In determining whether a trial court has improperly exercised jurisdiction under the UCCJA, we apply an abuse of discretion standard. Ashburn v. Ashburn, 661 N.E.2d 39, 41 (Ind.Ct.App.1996), trans. denied. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. Id.

B. Indiana Court's Jurisdiction
The UCCJA is the "exclusive method of determining the subject matter jurisdiction of a court in a custody dispute with an interstate dimension." Caban v. Healey, 634 N.E.2d 540, 542 (Ind.Ct.App. 1994), trans. denied. See also Ind.Code §§ 31-17-3-1 to -25; Ariz.Rev.Stat. §§ 25-1001 to -1067 (2001). Under the UCCJA, the court which first enters a custody decree on a matter gains exclusive jurisdiction only until the child and all parties have left the state. Stambolija v. Stambolija, 643 N.E.2d 5, 7 (Ind.Ct.App. 1994). This court has stated:
The fundamental principle underlying the UCCJA is that once a court with a jurisdictional basis exercises jurisdiction over a "custody" issue, that court retains exclusive jurisdiction over all custody matters so long as a "significant connection" remains between the controversy and the state, and that court alone has discretion to decide whether it will defer jurisdiction to the court of another state upon the basis that the other court is a more convenient forum to litigate the issues. A "significant connection" remains under the scheme as long as one parent continues to reside in the state rendering the initial determination.
Matter of E.H., 612 N.E.2d 174, 185 (Ind. Ct.App.1993), opinion adopted, 624 N.E.2d 471 (Ind.1993) (internal citations omitted).
Because the Indiana court entered the original custody determination in the paternity action, and because Father continues *724 to reside in Indiana, the Indiana court had continuing exclusive jurisdiction of custody matters concerning R.A.F. and J.L.F. despite their relocation to Arizona with Mother. The "home state" analysis engaged in by Mother is not necessary under these circumstances.[3]See, e.g., Wilcox v. Wilcox, 635 N.E.2d 1131, 1134-35 (Ind.Ct.App.1994) (because Indiana court had continuing jurisdiction by virtue of entering original custody order and because there is no indication that the Indiana court had declined to exercise that jurisdiction, "home state" analysis urged by mother who had relocated to Tennessee with the children was unnecessary).
It is true that the court which has exclusive jurisdiction may decline to exercise its jurisdiction if it determines that a different forum is in a better position to entertain the litigation. Id. at 1134. The relevant portion of Indiana's version of the UCCJA states:
(a) A court which has jurisdiction under this chapter to make an initial or modification decree may decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of the case and that a court of another state is a more appropriate forum.
* * *
(d) Before determining whether to decline or retain jurisdiction the court may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court with a view to assuring that jurisdiction will be exercised by the more appropriate court and that a forum will be available to the parties.
Ind.Code § 31-17-3-7. There is no indication in the record that the Indiana and Arizona courts communicated with one another concerning the appropriate course of action in this matter. However, there is also no indication that the Indiana court declined jurisdiction at any time such that Arizona would have rightfully assumed jurisdiction and Indiana lost jurisdiction.
Ordinarily, that would be the end of the matter. Indiana had continuing exclusive jurisdiction as the state pronouncing the original custody order, and it did not decline to continue to exercise that jurisdiction. However, because the Arizona court was not merely acting on a conflicting custody matter, but was acting pursuant to a dependency petitionthe equivalent of a child in need of services ("CHINS") petition here in Indianafurther discussion is appropriate.
In an intra-state jurisdictional contest, when a CHINS proceeding is commenced, no other court may entertain a proceeding which conflicts with the CHINS court's exclusive jurisdiction. See Fox v. Arthur, 714 N.E.2d 305, 307 (Ind. Ct.App.1999) ("[T]he commencement of a CHINS proceeding vests exclusive jurisdiction in the juvenile court, and no other Indiana court has jurisdiction to entertain any proceedings which conflict with that exclusive jurisdiction."). However, this same rule is not necessarily applicable in an inter-state jurisdictional contest.
In Matter of E.H., this court considered the application of the UCCJA to an Indiana court's exercise of jurisdiction pursuant *725 to our CHINS statute. In that case, mother and father lived in Texas and were the parents of two children. The Harris County, Texas, District Court granted them a divorce and primary physical custody was granted to mother. Mother moved to Indiana with the children. Following father's visitation with the children in Indiana, mother suspected he had sexually abused the children. Ultimately, the Marion, Indiana, Superior Court, Juvenile Division, found that the children were CHINS and entered certain orders requiring therapy for and evaluation of the children and affecting visitation with father. The court also terminated father's parental rights pursuant to then-Indiana Code section 31-6-5-4.3.[4] Father appealed, contending that the orders of the Indiana CHINS court were void for want of jurisdiction. A divided Court of Appeals held that the Indiana CHINS court should have deferred to the Texas courts in accordance with the UCCJA. Therefore, the Court of Appeals vacated the CHINS determination and dispositional order, and also vacated the termination of father's parental rights. Matter of E.H., 612 N.E.2d at 189 (Barteau, J., concurring in result; Chezem, J., dissenting).
Judge Sullivan authored the majority opinion and noted that the UCCJA at that time had a provision allowing a state to make custody determinations when the child is physically present in the state and "it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent." Id. at 184 (quoting Ind.Code § 31-1-11.6-3(a)(3)(B) (Burns Code Ed.1987)).[5] In such emergency circumstances, the CHINS court may modify a foreign decree but should assume " `temporary jurisdiction only for the duration of the emergency and [should terminate] its jurisdiction after the emergency has passed.' " Id. at 185 (quoting In re Lemond, 274 Ind. 505, 413 N.E.2d 228, 246 n. 15 (1980)). If, however, the CHINS court intends to exercise jurisdiction on an on-going basis or over a period of time extending beyond the immediate emergency, then the procedures of the UCCJA must be followed. Id. On transfer, our supreme court in a per curiam opinion concluded that "the lead opinion of Judge Sullivan correctly describes the applicable law and properly disposes of the issues on appeal" and adopted the lead opinion. Matter of E.H., 624 N.E.2d 471, 472 (Ind.1993).
We recognize that the facts of this case and the facts of E.H. are diametrically opposed: in E.H., it was a foreign decree that an Indiana CHINS proceeding would affect, whereas, here, it is an Indiana decree that a foreign dependency proceeding would affect. However, given the stated purposes of the UCCJA, given the advice Father received from Arizona authorities, and given the Arizona court's actions upon receiving the Indiana custody order, we have no reason to doubt that a result similar to E.H. would obtain under Arizona law. The Arizona dependency petition was filed in order to protect the children from what was deemed an emergency, and it was promptly dismissed when the Indiana court exercised its jurisdiction to resolve the matter, if only temporarily. Any exercise of jurisdiction by Arizona was temporary *726 [6] and did not in any way impact Indiana's ability to exercise its exclusive and continuing jurisdiction over the children. The Indiana court's order granting emergency temporary custody to Father was proper.

II. Mother's Due Process Concerns
Mother also alleges that her due process rights were violated in the handling of Father's emergency petition for change of custody.[7]

A. Standard of Review
An opportunity to be heard is essential before a parent can be deprived of custody. Jendreas v. Jendreas, 664 N.E.2d 367, 370 (Ind.Ct.App.1996), trans. denied. In addition, the relevant statutes contemplate an evidentiary hearing to determine whether there was a substantial change in at least one of the factors relevant to the children's best interests and whether modification would in fact be in the children's best interests. Alexander v. Cole, 697 N.E.2d 80, 83 (Ind.Ct.App.1998); see Ind.Code § 31-17-2-8 and Ind.Code § 31-17-2-21. Accordingly, an ex parte order is an extreme remedy which is intended to be temporary in nature. Alexander, 697 N.E.2d at 83. In the face of an emergency, the trial court balances the welfare of the children against the custodial parent's right to continued custody. Id.

B. Notice of Emergency Hearing Request
On August 7, 2000, Father's counsel faxed the following letter to Mother's counsel of record from the paternity proceedings:
Dear [Counsel]:
Attached you will find copies of the following materials I will tender to the Court this morning:
a. [Father's] Verified Petition for Emergency Change of Custody;
b. Chronological Case Summary Entry; and
c. Proposed Emergency Change of Custody Order.
Please call with your thoughts.
Appellant's Appendix at 81. The Verified Petition for Emergency Change of Custody, filed August 7, includes the following paragraph:
(9) I.C. XX-XX-X-X notice and opportunity to be heard was given to the Mother's existing counsel of record ... by FAX this date at 11:00 A.M., a true and accurate copy of which is attached hereto....
Appellant's Appendix at 27. The trial court held a hearing some time the afternoon of August 7, 2000; however, there is no indication in the record of the exact time at which Father's petition was filed or of the time it was heard.[8]
*727 Under the circumstances of this case, we think this notice could be considered reasonable. Mother resided in another state. It may be true, as Mother alleges in her brief, that Father was aware of her residence. See Appellant's Brief at 18. However, whether Father knew her address is irrelevant under these circumstances because it is unreasonable to expect an emergency situation to wait for resolution until a mailed notice could reach Mother and Mother could then contact counsel or travel to Indiana herself. Father reasonably could have believed that the most likely way to get notice to Mother and perhaps to have Mother's interests represented at a hearing on his petition was to notify her counsel of record in Indiana. Father's petition included a paragraph describing this notice to Mother through her counsel. The notice was not so defective as to deny Mother due process. In fact, we have held that an ex parte request for a temporary change of custody was properly granted where the mother did not receive any notice prior to the request and only received notice several days after the order was entered. See Wilcox, 635 N.E.2d at 1135 (father filed his request for temporary change of custody on August 14, order granting request was entered on August 16, mother received notice of the ex parte request when she received the order on August 22; "[u]nder the circumstances of this case, that is, an allegation of an emergency where each party lives in a different state, this notice can be considered reasonable.").[9]
*728 Moreover, as will be discussed below, the trial court was acting in the face of what was alleged to be, and what the court in fact determined to be, an emergency. The trial court temporarily granted the motion, but set a hearing three weeks later and told Father to serve Mother at the address listed for her in the dependency petition. Again, under these circumstances, it was reasonable for the trial court to grant the motion without waiting for Mother to actually appear in court.[10]

C. Existence of Emergency
Mother also alleges that Father's petition did not demonstrate on its face that there was an emergency justifying an immediate change of custody by ex parte order. She contends that the petition demonstrates Father had known for over a month that dependency proceedings were underway in Arizona, that "the children were ... safe and happy," and that there was no evidence of "any irreparable harm that would occur to the children...." Appellant's Brief at 18, 20. We disagree with Mother's characterization of the allegations in Father's petition. On Friday, August 4, 2000, the children were removed from Mother's care and placed in a foster home. Father filed his petition on Monday, August 7, 2000. The children may have been safe and out of harm's way in the foster home, but there is no reason why they should have to remain in the care of strangers awaiting adequate notice to Mother when there was a parent ready, willing and able to assume the custody and care of them. If the trial court had not granted the emergency petition, the State of Arizona temporarily would have continued to have custody of the children; at that particular point in time, Mother was not entitled to custody of the children, and her rights were not harmed by Father having custody of them rather than the State of Arizona.

Conclusion
The Indiana court had continuing and exclusive jurisdiction over custody matters by virtue of entering the original custody decree. As Father still resided in Indiana, and as the Arizona court only undertook to decide issues of custody on an emergency basis and promptly dismissed those proceedings when the Indiana court ruled, the Indiana court's order granting an emergency temporary change of custody to Father was proper. Moreover, because an emergency was alleged, the notice to Mother was sufficient for purposes of the temporary order. The judgment of the trial court denying Mother's Motion to Dismiss Father's petition and Motion to Set Aside the trial court's order is affirmed.
Affirmed.
KIRSCH, J., and SULLIVAN, J., concur.
NOTES
[1] The petition was also filed with respect to J.T., the child of Mother and another man. J.T. is not a part of this appeal.
[2] Father has not filed an Appellee's Brief in this cause. Where the appellee fails to file a brief, we do not undertake the burden of developing arguments for the appellee. In re Paternity of C.R.R., 752 N.E.2d 58, 60 (Ind.Ct. App.2001). Rather, we apply a less stringent standard of review in which we may reverse the trial court if the appellant makes a prima facie showing of reversible error. Crafton v. Gibson, 752 N.E.2d 78, 82 (Ind.Ct.App.2001). Prima facie, in this context, is defined as "at first sight, on first appearance, or on the face of it." Johnson County Rural Elec. Membership Corp. v. Burnell, 484 N.E.2d 989, 991 (Ind.Ct.App.1985). Where an appellant is unable to meet that burden, we will affirm. Paternity of C.R.R., 752 N.E.2d at 60.
[3] The trial court's order on Mother's motions indicates that the trial court may have labored under the same misconception that Mother now does; that Indiana was required to affirmatively find that it has jurisdiction. Because Indiana issued the original custody decree, this is not the case. Rather, Indiana presumptively has jurisdiction unless and until it declines that jurisdiction. Any other state seeking to modify Indiana's decree would be under an affirmative duty to question its jurisdiction.
[4] This section has been recodified at Indiana Code section 31-35-2-4.5.
[5] This provision is no longer a part of Indiana's version of the UCCJA. That provision was changed to grant jurisdiction if "the child is physically present in this state and the child has been abandoned...." Ind.Code § 31-17-3-3(a)(3).
[6] The stipulation entered into by the parties indicated that Mother had filed a Petition to Reinstate the Dependency Petition in the Arizona court. The Petition to Reinstate does not in any way affect the Arizona court's declination of jurisdiction when it dismissed the dependency petition in the first instance.
[7] As part of her due process argument, Mother alleges that the delay of over a year in holding a hearing on the merits of Father's petition was reversible error. However, this argument appears to be premature. Mother requested certification of the trial court's January 18, 2001 order on her Motion to Dismiss Father's petition for change of custody and her Motion to Vacate the trial court's order temporarily changing custody of the children to Father. The issues raised in those motions are the issues certified by the trial court and accepted by this court. We therefore decline to address this issue.
[8] Mother alleges both in her Motion to Vacate to the trial court and in her brief to this court that the notice was faxed to her counsel after the pleading was filed and the matter heard because the letter indicates that the pleadings would be filed "this morning," and the letter was not faxed until after noon. However, the file stamp on the petition is not time-stamped, and so there is no way to verify the time at which the petition was filed. Moreover, there is no clear indication in the record of the exact timing of the hearing in relation to the filing of the petition. It could perhaps be inferred from comments made during the hearing that the hearing was held late in the afternoon. For instance, the trial court noted that "I read through the whole file as we were waiting for a courtroom, unfortunatelywe had to wait today, otherwise we would have been heard earlier...." Appellant's Appendix at 54. At the conclusion of the hearing, the court noted that Father was "probably going to need to see if you can get the Judge's signature and get [it] certified before 4:30...." Appellant's Appendix at 55. Nonetheless, as will be discussed below, prior notice might not have been required at all, and so the timing of the events is not crucial to the outcome in this particular instance.
[9] We are cognizant of our supreme court's decision in In re Anonymous, 729 N.E.2d 566 (Ind.2000) in which the court noted that the Indiana Rules of Professional Conduct prohibit ex parte communications with a judge. Ind. Professional Conduct Rule 3.5(b). In that case, an attorney prepared a petition seeking an emergency order for change of custody after receiving a guardian ad litem's report. He put a copy of the petition in the mail to the opposing party, and took the petition to the courthouse for filing. While there, he spoke with the judge presiding over the case, told the judge of the petition, and urged the judge to read the guardian ad litem's report. The judge advised that he would read the report and told the attorney to return to court that afternoon. When the attorney returned, he obtained an order signed by the judge granting his petition. The attorney then telephoned counsel for the opposing party and notified him of the emergency proceedings and the order changing custody. Disciplinary proceedings were initiated against the attorney, who was issued a private reprimand in an opinion written "[f]or the education of the bar...." Id. at 567. The crux of the opinion was that, in such a circumstance, the attorney "should have properly notified opposing counsel of his intention to seek immediate emergency judicial relief, or certified to the court his efforts and any reasons why such notice could not be provided." Id. at 569. See also Advisory Op. No. 1-01 (Indiana Comm'n on Judicial Qualifications 2001). In this case, Father notified opposing counsel of the emergency petition and his intention to immediately tender the same to the court and also included in his petition a statement regarding the notice he had sought to provide. We see no conflict between our resolution of this case and the pronouncements in Anonymous.
[10] That a hearing was not actually held three weeks later is due in large part to Mother's subsequent actions. When the trial court entered the emergency order, it had every reason to assume that a hearing on a permanent change of custody would be held in three weeks. Three weeks is not an unreasonable time, especially here, where Mother resided out of state and would presumably need to make arrangements to travel back to Indiana. See Spencer v. Spencer, 684 N.E.2d 500, 502 (Ind.Ct.App.1997) (holding that eighteen month delay between emergency change of custody and hearing on permanent change of custody did not deny mother due process where she contributed to and was not prejudiced by the delay).